Slip Op. 12-71

## UNITED STATES COURT OF INTERNATIONAL TRADE

```
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x
SUCOCITRICO CUTRALE LTDA.           :
AND CITRUS PRODUCTS INC.,           :
                        Plaintiffs, :
                                    :
v.                                  :
                                    :
                                    :
UNITED STATES,                      :
                        Defendant,  :
                                    :
and                                 :
                                    :
FLORIDA CITRUS MUTUAL,              :
CITRUS WORLD, INC., SOUTHERN        :
GARDENS CITRUS                      :
PROCESSING CORPORATION, and         :
A. DUDA & SONS, INC.,               :
                                    :
              Defendant-Intervenors.:
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x
```

Before: Richard W. Goldberg, Senior Judge
Court No. 10-00261

**PUBLIC VERSION**

## OPINION

[Plaintiff's Motion for Judgment on the Agency Record under USCIT Rule 56.2 is granted in part and denied in part.]

Dated: June 1, 2012

*Christopher Allen Dunn* and *Matthew Paul McCullough*, Curtis, Mallet-Prevost, Colt & Mosle LLP, of Washington, D.C., for plaintiffs.

*Joshua Ethan Kurland*, Trial Attorney, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington, D.C., for defendant.  With him on the brief were *Tony West*, Assistant Attorney General, *Jeanne E. Davidson*, Director, and *Franklin E. White*, Assistant Director.  Of counsel on the brief was *George Kivork*, International Trade Administration, U.S. Department of Commerce, of Washington, D.C.

*Matthew Thomas McGrath* and *Stephen William Brophy*, Barnes, Richardson & Colburn, of Washington D.C., for defendant-intervenors Florida Citrus Mutual and Citrus World, Inc.

Goldberg, Senior Judge:  Plaintiffs Sucocitrico Cutrale Ltda. ("Cutrale") and its affiliated importer, Citrus Products, Inc. (CPI) (collectively, "Plaintiffs" or "Cutrale") contest the final results of the U.S. Department of Commerce's ("Commerce") antidumping duty determination. Plaintiffs challenge Commerce's factual findings and legal conclusions in the administrative review of the antidumping order on Certain Orange Juice from Brazil. *See Certain Orange Juice from Brazil*, 75 Fed. Reg. 50,999 (Dep't Commerce Aug. 18, 2010) (Final Results).

For the reasons discussed below, Plaintiffs' motion is granted in part and denied in part. The Court remands the Final Results to Commerce for reconsideration of its decision to zero when calculating Fischer's dumping margin.  The Court affirms Commerce's decisions with respect to the remaining issues.

## <u>BACKGROUND</u>

Cutrale is a Brazilian company that produces orange juice concentrate for the U.S. market.  On April 27, 2009, pursuant to 19 U.S.C. § 1675 (a)(2)(B), Commerce initiated a review of its antidumping duty order concerning orange juice from Brazil for the period of March 1, 2008 to February 28, 2009.  *See Initiation of Antidumping and Countervailing Duty Administrative Reviews and Request for Revocation*, 74 Fed. Reg. 19,042 (Dep't Commerce Apr. 27, 2009).  On April 13, 2012 Commerce published the preliminary results of the review.  *See Certain Orange Juice from Brazil*, 75 Fed. Reg. 18,794 (Dep't Commerce Apr. 13, 2010) (Preliminary Results).

On May 14, 2010, Cutrale filed an administrative case brief challenging, among other things, Commerce's decision to zero despite adverse World Trade Organization (WTO) rulings. However, at that time Cutrale did not specifically argue that Commerce's policy of zeroing in

administrative reviews, but not in investigations, was based on an impermissibly inconsistent

statutory interpretation.  Commerce rejected all of Cutrale's protests and issued the Final Results

on August 18, 2010.  *See* Final Results, 75 Fed. Reg. 50,999.

## JURISDICTION AND STANDARD OF REVIEW

This Court has jurisdiction pursuant to section 201 of the Customs Court Act of 1980, 28

U.S.C. § 1581(c) (2006).

This Court must "uphold Commerce's determination unless it is 'unsupported by

substantial evidence on the record, or otherwise not in accordance with law.'" *Micron Tech., Inc.*

*v. United States*, 117 F.3d 1386, 1393 (Fed. Cir. 1997) (quoting 19 U.S.C. § 1516a(b)(1)(B)(i)

(1994)).  When reviewing agency determinations, findings, or conclusions for substantial

evidence, this Court determines whether the agency action is reasonable in light of the entire

record.  *See Nippon Steel Corp. v. United States*, 458 F.3d 1345, 1350–51 (Fed. Cir. 2006).  This

Court affords Commerce's factual finding a tremendous amount of deference.  *See INS v. Elias-*

*Zacarias*, 502 U.S. 478, 483–84 (1992) (stating that in fact-intensive situations, agency

conclusions should be reversed only if the record contains evidence "so compelling that no

reasonable factfinder" could reach the same conclusion).

## DISCUSSION

Under the current antidumping law, Commerce imposes antidumping duties "on imported

merchandise that is being sold, or is likely to be sold, in the United States at less than fair value

to the detriment of a domestic industry."  *Micron Tech., Inc. v. United States*, 243 F.3d 1301,

1303 (Fed. Cir. 2001) (citing 19 U.S.C. § 1673).  The "dumping margin," which is the amount of

the duty to be imposed, "is the amount by which the price charged for the subject merchandise in

the home market (the 'normal value') exceeds the price charged in the United States (the 'U.S.

price')." *Id.* (citing 19 U.S.C. §§ 1673, 1677(25)(A)).  Where, as here, the foreign producer sells

directly to an affiliated purchaser in the United States, Commerce must calculate a constructed

export price (CEP) to use as the U.S. price for purposes of comparison.  19 U.S.C. § 1677a(b).

Thus, Commerce treated all of Cutrale's U.S. sales as constructed export price (CEP) sales

because Cutrale sells directly to its U.S. affiliate CPI.  19 U.S.C. §1677a(b).

      Cutrale produces only for export to the United States and does not sell goods in its home

market.  Thus, there is no "normal value" of goods in the home market or in any third country for

Commerce to compare with the CEP.  In this situation, Commerce calculates a "constructed

value" of goods in the home market to compare with the CEP.  19 U.S.C. § 1677b(a)(4).

Commerce must "consider all available evidence on the proper allocation of costs."  *Id.* §

1677b(f)(1)(A).  The statute does not provide specific guidance on the calculation of financial

expenses.  Therefore, Commerce has broad discretion to devise a method for calculating "general

expenses."  *Am. Silicon Techs. v. United States*, 334 F.3d 1033, 1037 (Fed. Cir. 2003).

      Cutrale raises seven issues on appeal: (1) whether Commerce's decision to zero in this

administrative review is unreasonable and not in accordance with law; (2) whether Commerce's

determination to exclude excess revenue Cutrale received from fees charged for port charges and

other expenses is in accordance with law; (3) whether Commerce improperly determined that,

because there is not a "substantial difference" between Cutrale's in the level of trade between the

home and U.S. markets, Cutrale is not entitled to a CEP offset; (4) whether Commerce

improperly used brix levels calculated to the hundredth of a degree in determining sales prices

and quantities; (5) whether Commerce improperly decided to calculate CPI's cost of holding

inventory in the United States based on the cost of financing in Brazil; (6) whether, in

determining the cost of production, Commerce improperly valued oranges received by Cutrale

from affiliated parties; and (7) whether Commerce improperly deducted byproduct sales revenue

when calculating Cutrale's general and administrative financial expense ratios.

**I.      Commerce must change or explain its inconsistent policy with respect to zeroing**

Cutrale challenges Commerce's decision to zero when it calculated Cutrale's constructed

export price during the administrative review.  Plaintiffs request that the Court either remand this

case to Commerce to explain its inconsistent statutory interpretation or require recalculation of

Cutrale's dumping margin zeroing.

As a preliminary matter, the Government contends that the Court should dismiss this

claim because Cutrale did not make this precise argument in its case brief and thus failed to

exhaust its administrative remedies.  Under 28 U.S.C. § 2637(d), this Court "shall, where

appropriate, require the doctrine of exhaustion of administrative remedies" in civil actions

arising from Commerce's antidumping duty determinations.  The doctrine of exhaustion

generally requires that the parties exhaust all administrative remedies before this Court will

consider the issue on appeal.  *Sandvik Steel Co. v. United States*, 164 F.3d 596, 599 (Fed. Cir.

1998).  In this case, enforcing the doctrine would mean that because Cutrale did not specifically

challenge zeroing as arbitrary in its administrative case brief, it is barred from doing so now.

However, several exceptions to the exhaustion doctrine allow the Court to consider

Cutrale's claim.  Most importantly, the doctrine of intervening judicial interpretation applies

here.[1]  *Corus Staal BV v. United States*, 30 CIT 1040, 1050 n.11 (2006).  This exception allows

the Court to consider an issue if "a judicial interpretation intervened since the remand

proceeding, changing the agency results."  *Id.*  Prior to the Court of Appeals for the Federal

Circuit's ("Federal Circuit") recent decisions in *Dongbu Steel Co. v. United States*, 635 F.3d

1363 (Fed. Cir. 2011) and *JTEKT Corp. v. United States*, 642 F.3d 1378 (Fed. Cir. 2011), it

appeared to be settled law that Commerce could refuse to zero in original investigations while

zeroing in administrative reviews.  However, the Federal Circuit's recent decisions constitute an

intervening interpretation that reversed the law as it had previously existed and therefore the

Court will consider Cutrale's zeroing argument.  *See Grobest & I-Mei Industrial Co. v. United

States*, 36 CIT __, 815 F. Supp. 2d 1342, 1350 n.11 (2012) ("As the decision in *Dongbu* was not

available prior to the final results in this administrative review, the court does not credit

Commerce's exhaustion argument.")

        In *Dongbu Steel*, the Federal Circuit questioned the reasonableness of Commerce's

inconsistent practice of zeroing in administrative reviews, but not zeroing in investigations.  635

F.3d at 1373.  The court held that it was arbitrary for Commerce to interpret the antidumping

statute to prohibit zeroing in original investigations while interpreting it to permit zeroing in

administrative reviews.  *Id.*; *see also* 19 U.S.C. § 1677(35) (charging Commerce with calculating

the dumping margin in both investigations and administrative reviews).  The court reasoned that

"[a]lthough 19 U.S.C. § 1677(35) is ambiguous with respect to zeroing and Commerce plays an

---

[1] Two other exceptions apply here as well and discussed in *Dongbu Steel Co. v. United States*, 43 CIT__, 677 F. Supp. 2d 1353 (2010).  In *Dongbu Steel*, the court held that the doctrine of exhaustion of administrative remedies did not preclude consideration of the merits of plaintiffs' zeroing claim because: (1) the question involved was a pure question of law and (2) raising the question of zeroing at the administrative agency would have been futile. 677 F. Supp. 2d at 1360–62.  Here, these same exceptions apply, in addition to the intervening judicial interpretation exception discussed above.

important role in resolving this gap in the statute, Commerce's discretion is not absolute."  635

F.3d at 1372.  Thus, the court remanded the case for Commerce to either satisfactorily "explain

its reasoning" for the inconsistent interpretation or to "choose a single consistent interpretation of

the statutory language" in both phases of the proceeding.  *Id.* at 1373.  In a subsequent case also

addressing the zeroing issue, the Federal Circuit noted that Commerce had "failed to address the

relevant questions—why is it a reasonable interpretation of the statute to zero in administrative

reviews, but not in investigations?"  *JTEKT Corp. v. United States*, 642 F.3d at 1384.

Therefore, the Court remands Commerce's determination and directs Commerce to

reconsider this issue in accordance with the decisions of the Federal Circuit.  *See also Union

Steel v. United States*, 35 CIT ___, 804 F. Supp. 2d 1356, 1367 (2011) (concluding that, despite

earlier cases approving of the use of zeroing, it is now appropriate to "direct Commerce to

provide the explanation contemplated by the Court of Appeals in *Dongbu* and *JTEKT Corp*").

**II.      Commerce properly excluded excess revenue that Cutrale received for port
          charges and other expenses**

Cutrale argues that Commerce improperly under-calculated Cutrale's CEP by excluding

revenue Cutrale received for its U.S. sales.  The CEP is "the price at which the subject

merchandise is first sold . . . in the United States . . . by or for the account of the producer or

exporter . . . ."  19 U.S.C. § 1677a(b).  Commerce calculates U.S. price by using a CEP that is

"net of any price adjustment . . . reasonably attributable to the subject merchandise," 19 C.F.R. §

351.401(c), including deductions for movement expenses under 19 U.S.C. § 1677a(c)(2)(A) and

19 C.F.R. § 351.401(e).

Cutrale charges its customers a flat fee in order to cover the port charges and other

expenses ("brokerage fees") involved in bringing orange juice into the United States.  The

brokerage fees generally exceed, and are not directly related to, the actual amount of the expenses.  Commerce disregarded revenues obtained from the brokerage fees that exceeded the actual amount of the expenses Cutrale incurred from brokerage services.  Cutrale argues that Commerce should have followed its long-standing practice of including in the CEP all revenue received "in connection with" the sale of a product, even if that revenue is stated as a separate line item on the invoice.  Plaintiff's Br. at 11.

However, the fees that Cutrale contests constitute a service charge rather than a charge for the subject merchandise.  Commerce properly determined that it was inappropriate to treat the fees as adjustments to U.S. price under section 1677a(c) or Commerce's regulations because these fees "related to the movement of subject merchandise and were attributable to the sale of movement services, not to the subject merchandise."  Gov't Br. at 18.  In contrast, "CEP is intended to be an approximation of ex-factory price and is used in place of export price when affiliated U.S. sellers, rather than the exporters, make the U.S. sales."  *Fla. Citrus Mutual v. United States*, 31 CIT 1461, 1465 & n.3, 515 F. Supp. 2d 1324, 1328 & n.3 (2007) (citing *Thai Pineapple Canning Indus. v. United States*, 23 CIT 286, 293 n.12 (1999).

Thus, Commerce reasonably determined to include only an offset equal to the full amount of moving expenses that Cutrale actually incurred.  Because this decision is supported by substantial evidence and is in accordance with law, this Court upholds Commerce's decision.

**III.        Commerce properly determined that Cutrale is not entitled to a CEP offset**

In some cases, a company's level of trade in the home market occurs at a more advanced stage of distribution than the level of trade in the United States.  If Commerce does not have sufficient data on sales in the two markets, it will be unable to determine how much to reduce the

foreign sale price to achieve a price comparable to the U.S. price.  In such cases, Commerce may calculate a constructed export price offset ("CEP offset").  A CEP offset is a reduction in normal value equal to "the amount of indirect selling expenses incurred in the country in which the normal value is determined on sales of the foreign like product . . . ."  *Micron Tech.*, 243 F.3d at 1305 (citing 19 U.S.C. § 1677b(a)(7)(B)).  Cutrale argues that its sales in its home market of Brazil are conducted at a substantially more advanced level of trade than its sales in the United States, and that Commerce improperly failed to consider this different level of trade in refusing to grant it a CEP offset.

A. Commerce's Statutory Interpretation Is in Accordance with Law

The law requires that Commerce establish normal value "to the extent practicable, at the same level of trade as the export price or constructed export price."  *Micron Tech.*, 243 F.3d 1301, 1304–05 (citing 19 U.S.C. § 1677b(a)(1)(B)(i)).  Cutrale argues that, in determining whether to grant a CEP offset, Commerce impermissibly reads into the statute a requirement of a "substantial" difference between the level of selling activities in the two markets.  Cutrale relies on the CEP offset provision, which states:

> When normal value is established at a level of trade which constitutes a *more advanced stage of distribution* than the level of trade of the constructed export price, but the data available do not provide an appropriate basis to determine under subparagraph (A)(ii) a level of trade adjustment, normal value *shall be reduced* by the amount of indirect selling expenses incurred in the country in which normal value is determined on sales of the foreign like product but not more than the amount of such expenses for which a deduction is made under section 1766a(d)(1)(D) of this title.

19 U.S.C. § 1677b(a)(7)(B) (emphases added).

However, this statute, when read in conjunction with Commerce's regulations, clearly requires a substantial difference in selling functions in the two markets in order for Cutrale to obtain a CEP offset.  Commerce's regulation concerning the CEP offset states:

> Differences in levels of trade. The Secretary will determine that sales are made at different levels of trade if they are made at different marketing stages (or their equivalent).  *Substantial differences in selling activities are a necessary, but not sufficient, condition for determining that there is a difference in the stage of marketing.*

*See* 19 C.F.R. § 351.412(c)(2) (emphasis added).  Thus, Commerce's regulations, when read in conjunction with the statute Plaintiffs cite, clarifies that a CEP offset is available only when there are "substantial differences in selling activities" between the levels of trade in the two markets.  *See* 19 U.S.C. § 1677b(a)(7)(B); 19 C.F.R. § 351.412(f)(iii).  Therefore, Commerce's interpretation is in accordance with law.

### B. COMMERCE'S FACTUAL DETERMINATION IS SUPPORTED BY SUBSTANTIAL EVIDENCE

Cutrale alternatively challenges Commerce's factual determination that there was not a substantial difference in the selling activities in two countries.  Cutrale claims that the record evidence demonstrates that Cutrale's sales to home-market customers are at a more advanced level of trade than its exports to affiliated U.S. importer and that it is therefore entitled to a CEP offset.  However, the differences that Cutrale notes are not sufficient to warrant a CEP offset.

Although Cutrale may perform more selling functions or may perform selling functions more intensely in its home market, these differences do not warrant a CEP offset.  The CEP offset provision applies in situations in which there is a substantial difference in the level of trade.  For example, the CEP offset provisions ensure "that a normal value wholesale price will not be compared to a United States CEP retail price."  *Micron Tech.*, 234 F.3d at 1305.

Commerce determined that Cutrale performed seven common selling functions at a similar level of intensity in both its home and U.S. markets, with "relatively minor differences" between the levels in the two markets.  *See* Gov't Br. at 27.  Commerce also found that the one additional home market function Cutrale performed—advertising—was not significant. Although Commerce noted minor differences between the two markets, these differences to not rise to the level required by the statute, such as the difference between wholesale and retail.  *See Micron Tech.*, 234 F.3d at 1305.  Thus, Commerce's factual determination that there is not a substantial difference in the levels of trade in the two markets is reasonable and supported by substantial evidence. Therefore, this Court upholds Commerce's decision that Cutrale is not entitled to a CEP offset.

### IV.   Commerce properly calculated prices and quantities of sales using brix levels calculated to a hundredth of a degree

Cutrale argues that Commerce unlawfully calculated its normal value by using a price that does not accurately reflect the price paid for the subject merchandise in the home market. Normal value is "the price at which foreign like product is first sold . . . in the ordinary course of trade" in the home market.  19 U.S.C. §1677b(a)(1)(B).  Cutrale's home-market contracts set the price on a whole-degree brix basis.  Therefore, Cutrale argues that the law *requires* that Commerce use Cutrale's contractual whole-degree brix number because that is the "price at which the foreign like product is first sold" in the Brazilian market.  *Id.*

However, in order to compare prices in the two markets, Commerce requires a consistent unit of measurement.  Cutrale employs different units of measurement for pricing in the home and U.S. markets.  In the United States, Cutrale sells orange juice upon a per-pound solid basis using brix levels calculated to two decimal places.  In contrast, in its home market, Cutrale sells

orange juice in metric tons and contracts for whole-degree brix figures.  However, for quality

control purposes in its home market, Cutrale also measures the actual brix samples of juice sold

and rounds this sample measurement to two decimal places.  Thus, Commerce used Cutrale's

brix sample measurement (brix calculated to two decimal places) instead of the whole-degree

brix listed on the contract.

It was reasonable for Commerce to do this for two reasons. First, although this is only a

sample measurement, the measurement calculated to a hundredth of a degree is more accurate

than a measurement calculated to the whole degree.  Second, Commerce seeks a consistent unit

of measurement to compare the prices in the home and U.S. markets.  It is reasonable to use the

more accurate measurement (calculated to a hundredth of a degree) when Cutrale has already

recorded that measurement.  Therefore, this Court upholds Commerce's decision to use brix

measurements calculated to two decimal places because it is reasonable, is supported by

substantial evidence, and is in accordance with law.

### V.   Cutrale failed to exhaust its administrative remedies in regard to its claim that Commerce improperly calculated Cutrale's carrying costs in the United States

Cutrale argues that Commerce improperly used Cutrale's home market short-term interest

rate in calculating its U.S.-affiliate CPI's inventory carrying costs.  As a preliminary matter,

Commerce urges the Court to decline to consider this issue because Cutrale failed to exhaust its

administrative remedies with respect to this argument.

Cutrale did not raise this claim in its administrative case brief.  As discussed earlier, a

party must exhaust its administrative remedies before bringing an action in this Court.  28 U.S.C.

§2637(d); 19 C.F.R. §351.309(c)(2); *Corus Staal*, 502 F.3d 1370, 1379 (Fed. Cir. 2007).  Unlike

the zeroing issue discussed earlier, none of the exceptions to the doctrine of exhaustion apply

here: this is not a pure legal question, raising the argument below would not have been futile, and

there are no intervening judicial interpretations. *See Corus Staal*, 30 CIT at 1050 n.11 (noting

exceptions to exhaustion doctrine). Moreover, Cutrale does not provide any grounds for the

Court to consider this new claim under any of the exceptions to the exhaustion doctrine.

Because Cutrale failed to challenge Commerce's methodology for calculating inventory

carrying costs during administrative proceedings, the Court declines to consider the issue.

### VI.    In determining the cost of production, Commerce properly valued the oranges that Cutrale received from affiliated parties

Cutrale argues that Commerce improperly valued oranges that affiliated parties sold to

Cutrale. Cutrale claims that Commerce compared the price of oranges received from affiliated

parties *exclusive* of freight and harvesting costs, with the price of the input from unaffiliated

parties that *included* freight and harvesting costs. Cutrale contends that this resulted in an

excessive increase in the cost of production.

However, contrary to Cutrale's current claim, Cutrale stated in questionnaire responses to

Commerce that both kinds of purchases included delivery costs. Oct. 21 QR at 20 (C.R. 34).

Thus Cutrale's claim that the orange prices Cutrale paid to unaffiliated suppliers included

delivery, but its affiliated suppliers' price did not, lacks a record basis. *See* Plaintiff's Br. at 32–

33.

When calculating a respondent's cost of production, Commerce's long-standing practice

is to determine whether inputs received from affiliated parties have been acquired for less than

the value of those same inputs received from unaffiliated parties. Section 1677b(f)(2) authorizes

Commerce to disregard a transaction that does not fairly reflect the market value of merchandise

under consideration and instead to base the amount upon what it would have been if the

transaction occurred between unaffiliated parties.  19 U.S.C. §1677b(f)(2).  Thus, to the extent

that the affiliated-party inputs have been received for less than the arm's length price of those

inputs, Commerce increases the value of the affiliated-party inputs equal to the average arm's

length price of those inputs.  Cutrale supplied Commerce with charts that revealed that the

average price Cutrale paid to its affiliated supplier was much less than that paid to its unaffiliated

supplier.  This pricing information supports Commerce's determination that the purchases were

not made at arm's length and its decision to increase the value of the inputs equal to the average

arm's length value.

Commerce's decision to adjust the cost of oranges Cutrale purchased from an affiliated

supplier was reasonable, in accordance with its standard practice, and consistent with statutory

directives.  Because Commerce's decision is reasonable and supported by substantial evidence

the Court upholds Commerce's decision.

## VII.   Commerce properly deducted byproduct sales revenue in calculating Cutrale's general and administrative expense ratios

Commerce calculates General and Administrative (G&A) and financial cost components

of a company's cost of production using a ratio of the company's total G&A or financial costs to

the company's total cost of goods sold (COGS).  Cutrale argues that Commerce improperly

deducted from Cutrale's COGS revenue received from the sale of byproducts, while not

deducting the G&A or financial costs incurred with respect to the sale of those byproducts.

However, Commerce properly adjusted its calculation of Cutrale's G&A and financial

expense ratios.  In its calculation, Commerce deducted byproduct revenue that Cutrale had

similarly deducted from the cost of manufacturing to which the ratios applied.  This method was

consistent with Commerce's standard practice and ensured that the ratios were arithmetically

correct and produced more accurate results.  Because the methodology Commerce used to

calculate Cutrale's total cost of producing the subject merchandise was both mathematically

correct and a reasonable exercise of its statutory discretion, this Court upholds Commerce's

decision.

## CONCLUSION AND ORDER

For the foregoing reasons, the Plaintiff's Motion for Judgment on the Agency Record is

granted in part and denied in part.  The Court **AFFIRMS** Commerce's decisions on issues II, III,

IV, VI, and VII. The Court declines to consider issue V because Cutrale failed to exhaust its

administrative remedies with respect to this issue.   The Court **REMANDS** this matter for

reconsideration of Commerce's zeroing policy, and such proceedings shall be consistent with the

opinions of this Court and the Federal Circuit.

Upon consideration of all papers and proceedings herein, it is hereby

**ORDERED** that the final determination of the United States Department of Commerce,
published as *Certain Orange Juice from Brazil*, 75 Fed. Reg. 50,999 (Dep't Commerce Aug. 18,
2010) (the "Final Results"), be, and hereby is, AFFIRMED IN PART and REMANDED to
Commerce for redetermination as provided in this Opinion and Order; it is further

**ORDERED** that Plaintiffs' Rule 56.2 Motion for Judgment on the Agency Record be,
and hereby is, GRANTED IN PART and DENIED IN PART as provided in this Opinion and
Order; it is further

**ORDERED** that Commerce, on remand, shall reconsider its decision to apply its zeroing
methodology in the *Final Results* and change that decision or, alternatively, provide an
explanation for its inconsistent construction of 19 U.S.C. § 1677(35) with respect to antidumping
duty investigations and administrative reviews; it is further

**ORDERED** that Commerce shall redetermine Plaintiffs' weighted-average dumping
margins, as appropriate, complying with this Opinion and Order; and it is further

**ORDERED** that Commerce shall have ninety days from the date of this Opinion and
Order in which to file its redetermination upon remand ("Second Remand Redetermination"),

which shall comply with all directives in this Opinion and Order; that the Plaintiffs shall have thirty days from the filing of the Second Remand Redetermination in which to file comments thereon; that Commerce shall have thirty days from the filing of Plaintiffs' comments to file comments.

/s/ Richard W. Goldberg
Richard W. Goldberg
Senior Judge

Dated: June 1, 2012
New York, New York